Tidewater Oil Company *v.* Poore (et al., Appellant).

Argued January 7, 1959. Before JONES, C. J., MUS-MANNO, JONES, COHEN and MCBRIDE, JJ.

reargument refused April 13, 1959.

*William A. Welsh* for Board of Commissioners of Upper Chichester Township, intervening appellants.

*Guy G. deFuria,* with him *J. Robert Twombley,* and *deFuria, Larkin and deFuria,* for property owners, intervening appellants.

*Albert Blumberg,* with him *Arthur Levy,* and *McClenachan, Blumberg & Levy,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 16, 1959:

Viewed from an airplane in midflight, a "tank farm" looks like a field dotted with neat, dignified mushrooms. Visited on the ground, however, a tank farm looks exactly like what it is—a succession of mastodonic, metallic tanks filled with liquids and gases of an inflammable and explosive character. The tanks under consideration in this case, 9 to 40 in number, were designed to measure from 40 to 48 feet in height, 70 to 120 feet in diameter, and calculated to hold from 1,334,000 to 4,032,000 gallons of gasoline and petroleum products, each. It would not take much imagination to see, in several formidable rows of tanks of this character, a potential combined Johnstown's Flood and Dante's Inferno, in the event of any mishap which, despite every precaution, is always within the awesome realm of possibility.

The Tidewater Oil Company, with the prospect of erecting and installing such tanks, purchased, through

its agent, Simon and Company, the Longbotham Farm*
of 62 acres in Upper Chichester Township, Delaware
County. The tract is open farm land, well drained,
excellently suited for home construction and located
within an area zoned "A Residential." Agents for The
Tidewater Oil Company applied to the Board of Upper
Chichester Township to have the zoning classification
of the Longbotham Farm changed from "A" Residence
to "C" Industrial. The change was refused. An at-
tempt was then made to obtain a permit from the town-
ship building inspector to accomplish the same end,
and this request was also declined. An appeal followed
to the township zoning board of adjustment, and again
the answer was No. Undaunted, Tidewater now ap-
pealed to the Court of Common Pleas of Delaware
County, and here perseverance was rewarded. The
court of common pleas reversed the decision of the
zoning board. The Commissioners of Upper Chichester
Township filed exceptions to the order and decree; they
argued before a court en banc, and Tidewater still held
its decision. Tidewater's long-contested-for victory,
however, was a Pyrrhic one because the township com-
missioners, also persevering, have appealed to this
Court which, now, under the established facts and the
applicable law, decides, for reasons which will soon be
outlined, to reverse the decision of the court of common
pleas, thus saving Upper Chichester Township from
the invasion of the Tidewater tanks. An appeal was
also taken by the owners of adjacent or nearby proper-
ties who had intervened in the court below.

The Delaware County court, in reversing the zon-
ing board of Upper Chichester Township, said: "The
contention of the appellants, that the refusal of the

---

* The Longbotham Farm consists in its entirety of 140 acres,
the rest of it being in Aston Township. That part of it, however, is
not involved in these proceedings.

Board to permit petroleum storage (which is permissible in a "C" Industrial District on their property) is unconstitutional, arbitrary and unreasonable and in abrogation of their legal rights, is a valid contention in the considered opinion of the Court."

In upholding Tidewater's contentions, the court did not specify on which particular ground it built its decision. It did not say whether it found the zoning orders unconstitutional or whether it concluded that the action of the board was arbitrary, unreasonable, and in abrogation of legal rights. The opinion supporting and explaining the decision, however, would rather suggest that the court paid little heed to the argument of unconstitutionality, and based its reversal squarely on the proposition that it disagreed with the township authorities as to whether the Tidewater tanks would be good or bad for the Township. The court said that there already existed a large area in the western part of Upper Chichester Township zoned for industrial use and that Tidewater's property "is situated practically in the geographical center of other properties now zoned industrially."

While we do not regard this point as the deciding feature in the case, as will be seen, we may say en passant that the record does not bear out the lower court's conclusion about the geographical center of a supposed industrialized area in Upper Chichester Township. The court probably so opined because some of the exhibits in the case seem to show that the Tidewater tract at its narrowest point is wedged in between vacant Sun Oil land which is zoned industrial and the Sinclair property which is zoned industrial and contains a tank farm. But it is to be noted that the distance between the Sun Oil land and the Sinclair property, even at this narrow point, is 2700 feet. A tract of rural land over a half mile wide is considerable ter-

rain to industrialize simply because it happens to touch two other properties zoned industrial, especially where the tract rests in a setting of homes, farms, and vacant land.

Some of the principles enunciated in the lower court's opinion are sound, and we do not intend to depart from them. In this connection, however, we call attention to the truism that the law is a mosaic and that the whole picture on any given subject cannot be gained until one's vision encompasses the entire mural dedicated to that topic. In reviewing the action of the board of adjustment, the lower court's jurisdiction was limited to determining whether there was substantial evidence to support the board's findings of fact and whether the record was free from mistake of law; also whether there was any abuse of discretion. (*Lindquist Appeal,* 364 Pa. 561; *Edwards Zoning Case,* 392 Pa. 188).

Instead of limiting itself to such a scope of review, the lower court pointed out that the Sun Oil Company and the Sinclair Refining Company already occupy a large area zoned for industrial use in the western part of Delaware County and that "The Township Commissioners by their legislative enactment have, in the opinion of the Court, created an industrial trend in the area which it is now too late to stop." Whether that trend actually exists or not may be disputed, but, in any event, it is for the township to decide whether, if the trend exists, it should be halted. In addition to its large manufacturing areas, Delaware County is blessed with beautiful home and farm land. The local authorities probably reasoned that industry was creeping up too close to this home land, menacing the health and welfare of its people, and threatening it with large ungainly depots and ponderous machinery, crushing out the rural beauty and scenic harmony of their town-

ship. They wished to prevent what they foresaw. There is always a point before a threatened collapse materializes, when something may be done to prevent the break. It may well be that if the legendary additional straw had not been loaded on to the camel's back, that proverbial dromedary might have lived out a long life, with vertebrae intact, its hump upright and proud of the part it played in helping to transport the world's burdens.

But, discussion of an industrial trend, and whether it should be stopped, is more academic than practical because we do not see in the record the engulfing industrialization which appeared to have overawed the court below. However, even if we accept its hypothesis, this does not mean that that creeping glacier of industrialization could not be stopped. To accept the court's reasoning would be to say that no municipality has the power to limit an encroaching imperilment. It would be to say that land contiguous to an industrial district, though zoned residential, must now also become industrial because of contiguity alone, and that, through a process of chain reaction, all residential land must eventually become industrial land. But neither law nor logic approves of this chameleon process. So long as a property owner is treated in accordance with standards of justice and fairness, he may not complain that a township, concerned about maintaining its predominating rural and residential characteristics, builds dikes to prevent the spread of a flood of steel and iron.

The township authorities have concluded, upon investigation, factual revelation, and expert testimony, that the building of the Tidewater tanks would harm somebody and, therefore it has the right, if not the duty, to take whatever measures the situation demands,

to prevent the realization of that threatened, foreseeable harm.

The lower court argued that since the Sinclair Oil Company has already erected tanks in the disputed area, there should be no objection to the erection of other tanks. But this point of view overlooks the realization that because one may stand so much unpleasant odor, peril, and unsightliness, does not mean that there is no limit to his tolerance. There can be a saturation point in every aspect of human absorption. The record clearly establishes that the operation of a petroleum storage depot as the one proposed here carries with it a substantial risk to health and safety. One witness testified that the fumes issuing from the Sinclair tanks were so bad "you could not even light a match, you would be afraid." An engineering expert testified that vast quantities of stored gasoline and oil would create a serious hazard from fire, spillage and fumes, and that this hazard would be constant, despite how the tanks might be constructed or inspected. Evidence that the tanks were to be of the "floating-roof" type (with the roof floating on the surface of the liquid, the tank thus expanding as more liquid is added), would speak for not only the possibility but the probability of vapor leakage. It would be a strange community indeed whose representatives would not weigh the dangers attendant upon the planting on its land of vast vats of conceivable catastrophe.

The Tidewater Oil Company emphasizes, and no one can doubt the sincerity of its expression, that it would meet all safety regulations and requirements of the Township and Commonwealth, but the Township could still fear a mishap and refuse to accept the risk, no matter how minimum, which inevitably accompanies stored-up explosives. Contemporary history records that the most eminent shipbuilding experts declared

before the Titanic sailed that she was unsinkable. Even in these days, in spite of the near-perfect methods for detecting icebergs at sea, the good ship Hans Hedtoft, a Danish ship which was on its maiden voyage and was equipped with the most scientific safeguards* and also called "unsinkable," disappeared from the face of the sea after wirelessing that it had collided with one of these glacial monsters of the deep.

The township authorities have the right to refuse to allow in the midst of its territory an omnipresent, possible disaster. No one could reasonably object if the township declined to permit a tiger farm within its geographical limits, regardless of the height of the walls built around the tigers, and regardless how expert might be the tiger trainers employed to guard these creatures of the jungle. The township authorities may equally refuse to allow dangerous fuel tanks in its residential district, even with whatever guarantees of safety the tank builders might make.

Disturbing as it may be to the individual landowner, he must understand the obligation he owes to his neighbors in society, which is organized for the benefit of all. We said in *Swade v. Springfield Township Zoning Board of Adjustment*, 392 Pa. 269: " 'By its very nature zoning impinges upon the right of a landowner to use his land in any way that he desires so long as he does not unduly interfere with his neighbor's right to use and enjoy his land. To this extent, zoning imposes a hardship on every landowner subject to the provisions of a zoning ordinance. It is a hardship, however, made necessary by consideration of the public welfare and is imposed by virtue of the police

---

* Built especially to fight the Arctic seas, the Hedtoft had a double hull, armored prow and stern, seven watertight compartments, the latest electronic devices and the most modern lifesaving gear. Not one of the 40 crewmen and 55 passengers survived.

power.' " We cannot say under the facts of this case, as already discussed, that the police power was improperly exercised in zoning the property in question "A" Residential. Our observations in *Bilbar Construction Co. v. Easttown Township Board of Adjustment*, 393 Pa. 62, are very apt here: ". . . what serves the public interest is primarily a question for the appropriate legislative body in a given situation to ponder and decide. And, so long as it acts within its constitutional power to legislate in the premises, courts do well not to intrude their independent ideas as to the wisdom of the particular legislation. Specifically, with respect to zoning enactments, judges should not substitute their individual views for those of the legislators as to whether the means employed are likely to serve the public health, safety, morals or general welfare."

In *Whitpain Township v. Bodine*, 372 Pa. 509, we made clear that: " '. . . zoning classifications are largely within the judgment of the legislative body and the exercise of that judgment will not be interfered with by the courts except in cases where it is obvious that the classification has no substantial relation to public health, safety, morals or general welfare.' Gratton v. Conte, 364 Pa. 578, 584, 73 A. 2d 381. The power to establish residential districts is settled (Jennings' Appeal, 330 Pa. 154, 198 A. 621)."

The lower court emphasized that the Longbotham Farm was appropriate for use as a tank farm, but an ordinance is not to be declared legally unsustainable merely because it may deprive the owner of the opportunity to devote his land to its most lucrative and profitable use. *Swade v. Springfield Township Zoning Board of Adjustment*, supra; *Pincus v. Power*, 376 Pa. 175. So long as the property in question may reasonably be used for purposes required by the zoning ordinance, the owner may not legally complain. *Garbev Zoning Case*, 385 Pa. 328.

In the case at bar there is no evidence that Tidewater will be subjected to any special hardship if it may not use the land as a depository for storage tanks. On the contrary, all of its principal witnesses conceded that the area would make a good housing development site, the very purpose for which any particular land is zoned "A" Residence. The fact that Tidewater does not care to use it as a housing site does not make the pertinent ordinance confiscatory and unreasonable.

We are satisfied that the lower court erred in substituting its views on regional planning and proper zoning, for those of the board of township commissioners. Its function was not to sit as a super board of commissioners. The court said in its opinion: "Delaware County is fortunate in having areas which have become heavily industrialized, thus affording our people the opportunity to work and earn good wages, which many other communities would be happy to enjoy. While this Court cannot and should not decide a zoning matter on the question of economics and community prosperity we cannot, in this case with its peculiar factual situation, resist the urge to at least make the foregoing comment."

However, after stating that it would not decide the case on the question of economics and community prosperity, it would appear that the court proceeded to be guided by those very reflections, reflections which should rise from the pool of legislative responsibility and not from the mirror of judicial deliberation.

Order reversed; costs on the appellee.